### PAROL CONTRACT TO CONVEY LAND.

Circuit Court of Cuyahoga County.

MARY THIBODEAU V. BARBARA KEVERN ET AL. *

Decided, January 22, 1912.

*Parol Contract as to Lands—Statute of Frauds.*

Payment of the consideration money, possession taken and lasting improvements made by the purchaser of lands under a parol contract, will take the contract out of the statute of frauds.

*H. C. Gahn,* for plaintiff in error.
*Kerruish, Kerruish, Hartshorn & Spooner,* contra.

WINCH, J.; MARVIN, J., and NIMAN, J., concur:

This action was heard on appeal, the plaintiff claiming title to certain premises described in her petition, which she occupies and from which the defendants were seeking to remove her by proceedings in forcible entry and detainer. She asks that said proceedings be enjoined and that she have specific performance of a parol contract to convey said premises to her, and for such further relief as may be just and proper.

We find the facts of the case to be as follows:

Upwards of four years ago the plaintiff, who is a widow with four children, the oldest of whom was then about seven years of age, was living with her brother, John Kevern, and supporting herself and her children by working at Chandler and Rudd's. Her brother William Kevern was a widower with no children and owned a piece of land at the corner of E. 91st street and Booth avenue in the city of Cleveland, on which there were then two houses fronting towards the west on E. 91st street, in one of which John lived and in the other, on the corner of Booth avenue, William lived.

Being desirous of a housekeeper, to take care of his house and cook his meals for him, and being desirous also of the

*Affirmed without opinion, *Kevern v. Thibodeau,* 88 Ohio State, 603.

company of his sister and her children, whom he desired to assist in their hard circumstances, he proposed to his sister Mary, the plaintiff that she give up her position at Chandler and Rudd's and come and live with him, act as his housekeeper and be company for him, he agreeing to furnish five dollars a week toward the table board and if that was not enough to pay for all the food needed for himself and Mary and her four children, then she should pay for all in excess of that amount, it being understood that she might have her spare time to work and earn money for that purpose. He also agreed to pay her for her services, but the amount of her compensation was not agreed upon at the time.

So Mary and her children took up their home with William, and Mary gave up her regular position at Chandler and Rudd's, but found it necessary to work there during noon, or rush hour, and to do sewing and take in washing so as to properly feed and clothe herself and children. In this she had help from William, from time to time, for he gave all of the children clothing and shoes, as did also their Uncle John and their grandfather Thibodeau. Indeed, the family in all its branches seems to have been loyal and worthy, understanding their duty to each other and especially to the widow Mary and her four little fatherless children.

This situation continued for about three years, during which time Mary, when she needed clothing for herself, would ask William for money and for payment for her services as his housekeeper, but he would put her off with a small payment of five dollars, telling her he would make it all right with her in the end.

These requests for payment and conversations about the matter occurred five or six times in the three years.

During these three years, William moved two small houses onto the lot, in the rear of his house, fronting them on Booth avenue; the most easterly of these houses he rented to a man named Chico. It was called the Chico place and is the premises now claimed by plaintiff. Chico had a garden in the yard back of his house and seems to have occupied all the land from the east line of William's property, to the second little house immediately in the rear of

the one on the corner, being twenty-six feet front on Booth avenue and extending back 132 feet to William's south line.

Finally, about November, 1910, William told Mary that he was going to get married and bring his wife home, and that she would have to get out with her children and their relations would have to cease.    Naturally she wanted to know what was going to become of her and what settlement he was going to make with her for her services, and he said he would give her the Chico place; that it ought to be enough for her, and to this arrangement she assented.

He sent for Chico and told him he would have to get out, for he had given the place to his sister Mary.    Chico demurred, said he had always paid his rent, didn't want to get out and offered $1,000 for the place.    William refused to sell, saying he had given the place to Mary, and if he took the thousand dollars he would have to turn it over to her, and if he did she would spend it, and it was better for her to have the home.

There was no gas in the house, and Mary wanted gas pipes run in and two stoves and gas fixtures installed, but William refused to make repairs or improvements, saying the place was hers and she would have to take it as it was—he had done enough for her. So her brother John put in the pipes and stoves and fixtures, Mary paying for the materials.    She also did some papering and painting.

On November 16, 1910, Mary and her children moved into the Chico place and have lived there ever since.

In August, 1911, William was suddenly killed in an accident, never having given Mary a deed of the premises in question. She doesn't seem to have understood what a deed was, or that she needed one.

Wllliam left one child, the defendant, Elizabeth Kevern, and a widow, the defendant, Barbara Kevern; he left no will.    About a month after her husband's death the widow instituted the proceedings in forcible detainer which are sought to be enjoined.

The question is whether the foregoing facts will take the case out of the statute of frauds.

It will be noticed that the consideration here claimed was the services of the plaintiff rendered to her brother as his house-

keeper and companion for three years. There was never any agreement between the parties as to the value of said services; indeed, on account of the relationship of the parties, it is almost impossible to put a value upon them.

How far the five dollars a week went to feed the children, we do not know; with the high prices prevailing in the last few years, it could not have gone very far. If for the board of himself and his housekeeper he had to pay only five dollars a week, he got off very reasonably, and if the children of Mary during these three years had a roof over their heads and he paid something towards their food and clothing, it is to be ascribed, in this family at least, to his bounty, rather than to compensation in part for Mary's services.

Considering the house worth $1,000 it may be perhaps, very liberal to pay for Mary's services, but the parties having come to an agreement with reference to a matter which is difficult for others to estimate, we conclude that Mary paid full consideration for the premises.

She was also put in possession of the premises.

In 23 Cent. Dig., 2422, pp. 318, it is said:

"Payment by a purchaser of land by parol, of the consideration money, and possession by him, will take the contract out of the statute of frauds."

Many cases are cited sustaining the text.

Mary also made lasting improvements upon the premises, which though slight, are entitled to consideration.

In the case of *Shahan, exr., et al* v. *Swan*, 48 O. S., 25, Judge Bradbury, on page 40 of the opinion says:

"Notwithstanding that it is the established rule in Ohio that the payment of the consideration, even in the personal services of the party seeking relief, does not ordinarily constitute such part performance as will take a case out of the operation of the statute of frauds, we do not wish to be understood to hold that cases may not arise wherein specific performance of a contract in parol may be had on the ground that the consideration had been paid in personal services, not intended to be and not susceptible of being measured by a pecuniary standard."

In this case, of course, the services were not rendered on a contract for the purchase of the premises; when rendered Mary expected to be compensated in money, but when she accepted the premises in payment for her services, made improvements upon them of lasting benefit to the freehold and took possession, it would seem that the contract to convey then entered into was completely executed, on both sides, the proper evidence of the transaction, in other words, a deed, only, being lacking, to protect her in her possession.

We have examined the opinion of this court in the case of *Schaefer* v. *Schultz*, decided in June, 1901, and later affirmed by the supreme court without report, 68 O. S., 690, and believe that the principles there announced warrant a judgment in this case in favor of the plaintiff. Indeed, the evidence in this case is clear and uncontradicted, while the difficulty in the case referred to was in determining who was telling the truth.

In the case of *Steinberger* v. *Hanna,* 42 O. S., 305, the court held that possession under the verbal contract, and payment of part of the consideration, took the case out of the statute of frauds.

As said in the case of *Sites* v. *Skinner,* 6 Ohio, 484, 489 :

"The fact of the vendor's looking on and seeing improvements made, when he intended to avoid the agreement, amounts to a fraud, and it is upon that ground that relief ought to be afforded." See also *Kelley* v. *Stanberry,* 13 Ohio, 408.

The relief prayed for in the petition is granted.